IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Susan Diane Scruggs, *as Personal Representative of the Estate of William Bradley Scruggs*,<br><br>Plaintiff,<br><br>v.<br><br>Bryan Stirling, *in his official capacity as Director of the South Carolina Department of Corrections*; Beverly Wood, *in her individual capacity*; Robert Poiletman, *in his individual capacity*; Rubin Ridgway; Antoinette Bradley, *in her individual capacity*; Tim Riley, *in his individual capacity*; Andrea Thompson, *in her individual capacity*; Kinnard Debose, *in his individual capacity*; Lefford Fate, *in his individual capacity*,<br><br>Defendants. | C/A No. 0:19-921-PJG<br><br>**OPINION AND ORDER ON SUMMARY JUDGMENT** |

Plaintiff Susan Diane Scruggs, as personal representative of the Estate of William Bradley Scruggs, filed this civil rights action pursuant to 42 U.S.C. § 1983. This case arises out of the murder of William Bradley Scruggs by two of his fellow inmates within the South Carolina Department of Corrections ("SCDC") on April 7, 2017.[1] This matter is before the court by consensual reference pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 73.02(B)(1) (D.S.C.) for an order on the defendants' motions for summary judgment. (ECF Nos. 104 & 106.) Plaintiff

[1] Scruggs and three other inmates were murdered by inmates Jacob Philip and Denver Simmons. The estates of all four victims also brought separate civil rights cases in this court against SCDC officials regarding purported security failures in the prison. Robinson v. Riley, C/A No. 0:19-826-PJG; Kelley v. Riley, C/A No. 0:19-827-PJG; King v. Riley, C/A No. 0:19-828-PJG; Scruggs v. Riley, C/A No. 0:20-1014-PJG. Additionally, the four victims also filed state tort lawsuits in state court that remain pending. Scruggs filed this separate action regarding purported failures in the mental health treatment of Scruggs, Philip, and Simmons.

filed a response in opposition to the motions (ECF No. 111), and the defendants replied (ECF Nos. 113 & 114). The court heard oral argument on the motions on December 2, 2021. (ECF No. 116.) Having reviewed the record presented and the applicable law, the court grants the defendants' motions except as to Plaintiff's failure to protect claim against Dr. Poiletman in his individual capacity.

## BACKGROUND

The following facts are either undisputed or are taken in the light most favorable to Plaintiff, to the extent they find support in the record. On April 7, 2017, inmates Denver Simmons and Jacob Philip of the South Carolina Department of Corrections separately lured four inmates into Simmons's cell in the Kirkland Correctional Institution and killed them between the hours of 7:49 a.m. and 10:13 a.m. One of the inmates killed was William Scruggs. All six inmates were part of SCDC's Intermediate Care Services ("ICS") unit of Kirkland, which provides residential services for inmates with serious and persistent mental illness who require intensive treatment, monitoring, and care, but not psychiatric hospitalization.

### A.    Class Action Lawsuit

In June 2005, a class of seriously mentally ill SCDC inmates filed a lawsuit in the Richland County Court of Common Pleas against SCDC for declaratory and injunctive relief from SCDC's purportedly flawed mental health program. T.R. v. S.C. Dep't of Corr., C/A No. 2005-CP-40-001080. The class was composed of inmates who had been hospitalized for psychiatric services, referred to SCDC's Intermediate Mental Health Care Services Unit, or diagnosed by a psychiatrist with a range of mental illnesses including schizophrenia, schizoaffective disorder, paranoia, major depression, bipolar disorder, and psychotic disorder. The class included Scruggs, Philip, Simmons, and the other murder victims. The class alleged that their mental health treatment in SCDC was

systemically flawed in violation of the South Carolina Constitution's prohibition on cruel, corporal, and unusual punishment.  S.C. Const. Art. 1, § 15.  After a bench trial, the court entered a final order in favor of the class, identifying areas requiring remediation by SCDC within its mental health program.  The trial court found that SCDC's treatment of the class violated South Carolina's prohibition on cruel and unusual punishment, the legal standard for which the trial court concluded mirrors the prohibition by the same name in the Eighth Amendment to the United States Constitution.

The trial court identified many deficiencies in SCDC's mental health treatment to support its conclusion that the program was constitutionally inadequate.  Among the findings, the trial court specifically identified the limited involvement of SCDC psychiatrists, including Defendant Dr. Robert Poiletman, in inmate treatment as a contributing factor to the constitutionally inadequate treatment.  The trial court stated:

> A substantial contributing factor to the lack of an effective treatment program is the limited involvement of psychiatrists in creating and administering treatment plans for mentally ill inmates.  Psychiatrists at SCDC have no administrative or policy-making duties, and there is evidence that they do not attend meetings to create and develop treatment plans for inmates.  The Court finds that psychiatrists, as the lead mental health professionals in the mental health program, must be more directly involved in creating and developing treatment plans.  Furthermore, deposition testimony of some psychiatrists reveals an alarming lack of knowledge of policies and procedures at SCDC, the levels of care and criteria for referral to a particular level of care, and the role of the counselor in the mental illness treatment process.  For example, SCDC psychiatrist Dr. Poiletman did not know what the terms SMU and CI stood for—meaning Special Management Unit and Crisis Intervention—terms inextricably tied to mentally ill inmates at SCDC.  He did not know the difference between Area Mental Health patients and outpatients, did not know what mental health counselors do, and had "no idea" who drafted treatment plans.  Likewise, Dr. Crawford, the principal psychiatrist at Graham, could not describe the distinction between an Intermediate Care Services patient and an Area Mental Health Patient.  She did not review treatment plans and did not start attending treatment team meetings until after her deposition.  Dr. Woolery, the principal psychiatrist at Lee, was unfamiliar with treatment plans, did not know whether any of her patients were in Lee Supermax, and had never seen Lee Supermax herself.  The Court finds these examples both illuminating and disturbing.  For psychiatrists

> and other mental health staff at SCDC to provide effective services, they must have a more intimate knowledge of the processes and procedures vital to the mental health services system they are expected to direct.

(Pl.'s Resp., Ex. 4, ECF No. 111-4 at 74-75.)

On appeal, the parties reached a settlement agreement that created a comprehensive plan to address the areas in need of remediation identified by the trial court's order. The settlement agreement required SCDC to: (1) develop a systematic program for screening and evaluating inmates to more accurately identify those in need of mental health care; (2) develop a comprehensive mental health treatment program that prohibits inappropriate segregation of inmates in mental health crisis, requires improved treatment of mentally ill inmates, and substantially improves SCDC mental health care facilities, including: (a) increasing access to higher levels of care, (b) reducing the use of segregation and increasing out-of-cell time for inmates in segregation, and (c) reducing the use of force against mentally ill inmates; (3) employ a sufficient number of trained mental health professionals; (4) maintain accurate, complete, and confidential mental health treatment records; (5) revise its pharmaceutical policies and developing a formal quality management program for psychotropic medication; and (6) develop and revise policies related to the diagnosis, treatment, housing, and management of inmates with mental illness. The agreement required the plaintiffs to dismiss their action; and accordingly, the trial court's final order was vacated.

**B. Sandra Johnson**

Sandra Johnson is a licensed social worker who worked as a clinical counselor for SCDC from December 2015 to December 2016. Johnson described the counseling provided by other counselors in ICS, including Defendant Lead Counselor Antoinette Bradley, as "cursory" and "superficial," amounting to "anti-care." (Johnson Statement at 50, 64, ECF No. 112-13 at 14, 17.) Johnson explained that counselors' individual counseling sessions often lasted approximately five

minutes and consisted of merely asking inmates a list of questions while standing outside their cell. Johnson pointed out that Lead Counselor Bradley would often not even enter any information for her inmate encounters in SCDC's electronic medical record system. Johnson also noticed that counselors would falsify their notes by stating they visited inmates when the inmates said they had not seen their counselor and the counselor had not signed into the visitor's log of the ICS unit. According to Johnson, inmates generally received counseling only once every two or three months, despite SCDC policy stating inmates should be provided counseling twice per month.

Johnson believed that during her tenure the ICS unit became increasingly unsafe as the lack of treatment for the inmates led to "weekly incidents of life-threatening events for inmates and staff." (Johnson Statement at 60-61, ECF No. 112-13 at 16-17.) Johnson observed incidences of correctional staff abusing inmates by encouraging their delusions and publicly discussing their diagnoses to humiliate them. Johnson further observed correctional staff allow inmates with a history of cutting or self-harm to have razor blades and then fail to provide medical attention or take the razors away when the inmates cut themselves or swallowed the blades because, according to correctional staff, the inmates wanted attention, the behavior was normal, and they could not take away the blades because the inmate was holding a lethal weapon.

In February 2016, Johnson took her concerns to Defendant Bradley, who told Johnson that Johnson was counseling inmates too often and for too long. Johnson was seeing inmates weekly but Bradley told Johnson that Johnson should only be seeing inmates who were having problems. Rebuffed by Bradley, from February to June 2016, Johnson took her concerns about the quality of inmate counseling "up the chain of command" to SCDC's Chief Psychologist Dr. Ridgeway,[2] Warden of Kirkland Correctional Institution Tim Riley, Associate Warden Andrea Thompson,

[2] Dr. Ridgeway's name is spelled incorrectly in the caption of the Complaint.

SCDC Division Deputy Director of Behavioral Health Kennard DuBose,[3] and SCDC Deputy Director of Health Services Lefford Fate. (Johnson Statement at 59, ECF No. 112-13 at 16.) Johnson documented her concerns to these officials and included incident reports and emails that Johnson claims substantiated her concerns. However, none of the officials Johnson warned made any changes to the counseling program and Johnson herself was reprimanded and ultimately fired. Johnson described the SCDC officials' response as "shooting the messenger." (Id. at 66, ECF No. 112-13 at 18.) Johnson was fired in December 2016. According to Johnson, her termination was in retaliation for raising these concerns.

**C. Plaintiff's Decedent, William Scruggs**

Scruggs entered SCDC on April 29, 2010 to serve a life sentence for murder, first-degree burglary, kidnapping, and unlawful possession of a firearm. The trial court found Scruggs guilty but mentally ill and Scruggs was originally admitted to SCDC's Gilliam Psychiatric Hospital. In June 2010, Scruggs was transferred to the ICS unit where he remained for three years until he was transferred to Lieber Correctional Institution due to another inmate's alleging that Scruggs sexually assaulted him. After spending more than two years at Lieber, Scruggs was placed on crisis intervention because of self-injurious behavior and readmitted to Gilliam Psychiatric Hospital in July 2015. Scruggs was returned to Lieber on August 21, 2015 and quickly placed on crisis intervention again for suicidal gestures and self-injurious behaviors. He was readmitted to ICS on September 2, 2015.

Scruggs began treatment with Defendant Dr. Poiletman upon his reentry to ICS in September 2015 and up until his murder. Dr. Poiletman diagnosed Scruggs with major depressive disorder with psychotic features, anxiety, history of cutting, and history of malingering. Dr.

[3] DuBose's name is spelled incorrectly in the caption of the Complaint.

Poiletman generally saw Scruggs for psychiatric evaluations at least once per month, prescribed medications to treat Scruggs's mental illnesses, and monitored the medicine's effectiveness. Defendant and Lead Counselor Antionette Bradley was Scruggs's mental health counselor at the time and generally saw him monthly for individual counseling sessions. Scruggs also generally attended group therapy sessions, usually several times per month. Scruggs had a treatment plan created by a treatment team, which met regularly and included Dr. Poiletman, Lead Counselor Bradley, Associate Warden Thompson, and Chief Psychologist Dr. Ridgeway.

From November 29, 2016 to January 19, 2017, Scruggs did not see a counselor or attend a group therapy session. However, Scruggs attended his monthly evaluations with Dr. Poiletman during that time. On March 14, 2017, Scruggs cut his wrist with a razor blade and was placed on crisis intervention. Scruggs told medical personnel that he cut himself because he was in pain from walking up the stairs and he wanted to change to a downstairs room. In response to this incident, Scruggs met with the treatment team on March 16, 2017 to discuss his treatment plan. Scruggs told the treatment team that he was not being treated properly by the medical staff[4] and requested a transfer to another institution. The treatment team recommended that Scruggs remain in the ICS unit because the ICS program was beneficial to his mental health. Scruggs agreed.

[4] Scruggs at the time was being treated for non-mental health related medical issues including knee pain, dry skin, and hemorrhoids.

**D. Jacob Philip**

Jacob Philip was incarcerated with SCDC in August 2015 following his convictions for murdering his girlfriend and her eight-year-old daughter. Philip reported hearing voices right before the murders telling him to kill his victims. During his pretrial detention, Philip self-mutilated, attempted suicide, and attacked another inmate in the shower after hearing voices. Philip was ultimately sentenced to life imprisonment without the possibility of parole.

Philip was originally admitted to Gilliam Psychiatric Hospital and later transferred to the ICS program in December 2015. Philip was also treated by Dr. Poiletman, who saw Philip at least once per month for psychiatric evaluations. Dr. Poiletman diagnosed Philip with schizoaffective disorder and borderline personality disorder, prescribed Philip medication, and monitored the medicine's effectiveness. Like Scruggs, Philip regularly attended individual counseling and group therapy sessions, and his treatment plan was monitored by the same treatment team. Until the April 2017 murders, Philip had no incidents of self-harm or violence in the ICS unit.

In the months prior to the April 2017 murders, Philip reported depression, anxiety, paranoia, ideas of reference, and auditory hallucinations. Dr. Poiletman saw Philip for regular evaluations during this time and adjusted his medication. Philip also attended regular individual counseling during this time during which he discussed his history of trauma and reported pent up energy that he could not burn off. The counselor during this time recommended that Philip undergo intense therapy to address these issues. In his last meeting with Dr. Poiletman before the murders, Philip again reported auditory hallucinations. Dr. Poiletman ordered a new medication regimen and recommended that Philip join a symptom management group to help with the auditory hallucinations.

**E. Denver Simmons**

Denver Simmons entered SCDC in September 2010 to serve a life sentence without the possibility of parole due to multiple murders. Simmons was housed in multiple facilities within SCDC but, relevant here, he was admitted to the Gilliam Psychiatric Hospital in November 2015 and then transferred to the ICS unit in March 2016. Simmons's mental health history included a history of depression, anxiety, suicidal ideations and behaviors, substance abuse, and anger management. Simmons was twice placed on crisis intervention for self-mutilation in 2016—in March and November. In October 2016, Simmons told counselors that he had thoughts of dying and counselors noted that Simmons had moderate to severe anger problems. Simmons was seen for individual counseling sessions while he was on crisis intervention in November 2016, but after that, Simmons did not have any individual counseling sessions before the murders and he attended only one group therapy session (on behavior modification), just days before the murders. Simmons did continue to have regular visits with Dr. Poiletman during that time and Simmons met with the treatment team to update his treatment plan on February 16, 2017.

**F. April 2017 Murders**

Philip and Simmons were designated by SCDC officials as head "ward keepers" in the ICS unit. Head ward keepers were tasked with keeping stock of cleaning supplies and distributing those supplies to other inmates. Because of these duties, Philip and Simmons had the privilege of having their cell doors unlocked between the hours of 6:00 a.m. and 6:00 p.m., during which time they were free to move about the unit. The other inmates were permitted to go to Philip's or Simmons's cells to obtain cleaning supplies.

On the morning of April 7, 2017, Philip and Simmons lured inmates John King, William Scruggs, Jimmy Ham, and Jason Kelley into Simmons's cell one by one and murdered each by

strangulation, using extension cords, broom handles, and their arms. Scruggs was apparently strangled and beaten in the chest. The murders occurred between 7:49 a.m. and 10:13 a.m. No other inmates or SCDC officers noticed the murders as they occurred, so around 10:13 a.m., Philip and Simmons walked out of the dorms into the prison's administration building where Simmons told officers to check his cell. Officers found the four dead inmates in Simmons's cell. Philip and Simmons admitted that they planned the murders and expressed no remorse. Philip stated to investigators that he hated people and that he and Simmons would have killed a fifth person, but they did not have time. Simmons later claimed to a journalist that he killed the inmates because he wanted to receive the death penalty.

**G. Procedural History**

Plaintiff filed this action pursuant to 42 U.S.C. § 1983 on March 26, 2019. In the Complaint, Plaintiff seeks damages against the defendants in their individual capacities, except for Bryan Stirling, who is named in his official capacity as the Director of SCDC. As to the individually named defendants, Plaintiff brings two causes of action. First, Plaintiff claims the defendants were deliberately indifferent to the serious medical needs of Scruggs, in violation of the Eighth and Fourteenth Amendments.[5] Second, Plaintiff claims the defendants were deliberately indifferent to the medical needs of Philip and Simmons, in violation of the Eighth and

[5] A claim of deliberate indifference to a risk of harm to a convicted prisoner is properly brought pursuant to the Eighth Amendment's Cruel and Unusual Punishment Clause, rather than the Due Process Clause of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988); see also Cooleen v. Lamanna, 248 F. App'x 357, 362 (3d Cir. 2007) ("The very viability of his Eighth Amendment claims means that his substantive due process claims are without merit, as the Supreme Court has explained that 'if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.' ") (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998)).

Fourteenth Amendments.[6]  As to Defendant Stirling, Plaintiff claims he failed to establish a constitutional regime for providing medical and mental health treatment for inmates in SCDC.

The defendants, in two groups with separate counsel, filed separate motions for summary judgment.  The "SCDC Defendants" include Director Stirling, Warden Riley, and Associate Warden Thompson.  The "Medical Defendants" include Dr. Poiletman, Bradley, Dr. Ridgeway, SCDC Director of Behavioral Health Dr. Beverly Wood, DuBose, and Fate.

At oral argument, Plaintiff clarified that she seeks to establish supervisory liability against every defendant named in his or her individual capacity (that is, everyone but Stirling), as to both the failure to protect and deliberate indifference to medical needs claims.  Plaintiff also seeks to establish direct individual liability for both the failure to protect and deliberate indifference to medical needs claims against Dr. Poiletman, Bradley, Dr. Ridgeway, and Thompson.

## DISCUSSION

### A.    Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of

---

[6] In the Complaint, Plaintiff asserts that her theory of liability for this cause of action is that the defendants were deliberately indifferent to the medical needs of Philip and Simmons, which caused them to murder Scruggs and others.  At oral argument, Plaintiff clarified that the theory of liability for this claim is that the defendants failed to protect Scruggs from a risk of violence at the hands of Philip and Simmons.  The court therefore refers to this claim as one for "failure to protect" rather than deliberate indifference to medical needs.

summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B. Failure to Protect Scruggs from Inmate Violence**

A legal action under 42 U.S.C. § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707 (1999). To state a claim under § 1983, a plaintiff must allege: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

The Eighth Amendment to the United States Constitution expressly prohibits the infliction of "cruel and unusual punishments," U.S. Const. amend. VIII, and imposes a duty on prison

officials to provide humane conditions of confinement, including the protection of inmates from violence at the hand of their fellow inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994); see also Makdessi v. Fields, 789 F.3d 126, 132 (4th Cir. 2015) ("Prison officials are, therefore, obligated to take reasonable measures to guarantee inmate safety."). Thus, "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer, 477 U.S. at 828.

To proceed with a deliberate indifference claim, a plaintiff must demonstrate: (1) objectively, the deprivation suffered or injury inflicted was "sufficiently serious," and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." Id. at 834; Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996); see also Anderson v. Kingsley, 877 F.3d 539, 545 (4th Cir. 2017) ("Farmer defines deliberate indifference as the *intentional* taking of a risk that the defendant knows *might cause harm* while *lacking any intent to cause such harm*."). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.' " Iko v. Shreve, 535 F.3d 225, 238 (4th Cir. 2008) (citing Wilson v. Seiter, 501 U.S. 294, 298-300 (1991)). "What must be established with regard to each component 'varies according to the nature of the alleged constitutional violation.' " Williams, 77 F.3d at 761 (quoting Hudson v. McMillian, 503 U.S. 1, 5 (1992)).

In the context of a claim that prison officials acted with deliberate indifference to a substantial risk of harm, the objective prong requires a plaintiff to show that he was "incarcerated under conditions imposing a substantial risk of serious harm." Farmer, 511 U.S. at 834; see also Makdessi, 789 F.3d at 133. "To demonstrate such an extreme deprivation, a prisoner must allege a serious or significant physical or emotional injury resulting from the challenged conditions."

Brown v. N. C. Dep't of Corr., 612 F.3d 720, 723 (4th Cir. 2010) (quoting Odom v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003)).

The subjective prong, on the other hand, requires the plaintiff to show that prison officials acted with deliberate indifference to inmate health or safety. Farmer, 511 U.S. at 834; see also Makdessi, 789 F.3d at 133. In other words, the official must "consciously disregard" a known risk of serious harm. Anderson, 877 F.3d at 544 (quoting Farmer, 511 U.S. at 839). "[D]eliberate indifference entails more than ordinary lack of due care for the prisoner's interests or safety, and more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." Makdessi, 789 F.3d at 133 (quoting Farmer, 511 U.S. at 835) (internal quotation marks and alterations omitted); see also Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law.") (citing Farmer, 511 U.S. at 836). Thus, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. However, the plaintiff must show more than mere constructive knowledge of the risk. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[I]t is not enough that the official *should have* recognized that his actions were inappropriate; the official actually *must have* recognized that his actions were insufficient.").

Direct evidence of actual knowledge, though, is not required. The subjective prong can be met with circumstantial evidence, such as evidence that the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." Makdessi, 789 F.3d at 133 (quoting Farmer, 511 U.S. at 842-

43). Accordingly, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" and "prison officials may not simply bury their heads in the sand and thereby skirt liability." Makdessi, 789 F.3d at 133 (quoting Farmer, 511 U.S. at 842).

Plaintiff claims that Defendants Dr. Poiletman, Bradley, Dr. Ridgeway, and Thompson were deliberately indifferent to the risk to other inmates from Philip's and Simmons's propensity for violence and failed to protect Scruggs from them. Specifically, Plaintiff claims that the defendants were aware that Philip and Simmons were dangerous, not receiving adequate mental health care, and decompensating, and that the defendants failed to take action to prevent Philip and Simmons from harming other inmates. In support, Plaintiff relies on the opinion of her expert, Dr. David S. Husted, who opines that "there were indefensible and egregious gross deviations from the standard of care by Dr. Poiletman and the mental health team at SCDC, with acts of conscious indifference that directly led to Denver Simmons conspiring with Jacob Philip to murder [four] inmates due to severe mental illness." (C/A No. 0:19-826-PJG, Husted Suppl. Report, ECF No. 112-23 at 8.)[7]

The court finds that the evidence of record can only reasonably support such a claim against Dr. Poiletman. Dr. Poiletman has failed to show on this record that he is entitled to judgment as a matter of law on Scruggs's Eighth Amendment claim for failure to protect. Plaintiff has presented circumstantial evidence that Dr. Poiletman, who was Philip's treating psychiatrist, knew that Philip

[7] This evidence was filed as an exhibit in a related case that was consolidated for discovery purposes. See Robinson v. Riley, C/A 0:19-826-PJG.

presented a lethal danger to others when he experienced auditory hallucinations.[8]  (See Med. Recs., ECF No. 118-2 (summarizing a phone call from Dr. Schwartz-Watts around the date of Philip's admission to SCDC's Gilliam Psychiatric Hospital in which she warned to "take [Philip] serious[ly] when he is hearing voices" and that Philip had a "long history of command auditory hallucinations"); C/A 0:19-826-PJG, ECF No. 112-22 at 3[9] (caseworker's initial assessment upon Philip's entry into SCDC summarizing Philip's self-reporting his history of command auditory hallucinations in which he hears his mother's voice instructing him to harm others, and explaining that he heard her voice prior to murdering his girlfriend and her daughter); Schwartz-Watts Psychiatric Evaluation, ECF No. 118-1 at 1-7 (summarizing prior incidents of violence by Philip based on commend auditory hallucinations); Husted Aff. ¶ 7a, ECF No. 1-2 at 2 (averring that the standard of care requires a psychiatrist to conduct a comprehensive medical history); Wood Dep. at 106:9-108:2, ECF No. 112-14 at 106-08 (agreeing with Husted's affidavit testimony at ¶ 7a)). And Dr. Poiletman's own treatment notes show that Philip reported auditory hallucinations to Dr. Poiletman in March of 2017, mere weeks before the murder of Scruggs and the other three decedents.  (Med. Rec., ECF No. 108-13 at 3.)  But the record is devoid of evidence that Dr. Poiletman took any action to alert the treatment team or security personnel to the substantial, imminent danger Philip posed to others.  See Cox v. Quinn, 828 F.3d 227, 236-37 (4th Cir. 2016) (affirming the district court's denial of summary judgment on the plaintiff's failure to protect

---

[8] Plaintiff also contends that Dr. Poiletman had actual knowledge that taking Philip off Risperdal could cause him to decompensate and commit violence.  (Husted Suppl. Report, C/A No. 0:19-826, ECF No. 112-23 at 2).  However, the medical records do not support Dr. Husted's characterization of Dr. Schwartz-Watts's recommendation about Risperdal for Philip.  (Schwartz-Watts Psychiatric Evaluation, ECF No. 118-1 at 7) (recommending Philip be placed on other drugs, but not Risperdal).

[9] See supra note 7.

claim, where the defendants knew of a serious danger to an inmate's safety and could have averted the danger easily but failed to do so) (quoting Brown, 612 F.3d at 723); see also Cox, 828 F.3d at 237 ("[T]he Eighth Amendment requires more than *some* action:  It requires *reasonable* action.") (citing Farmer, 511 U.S. at 844); (Ridgeway Dep. at 69:3-70:12, ECF No. 112-15 at 70-71) (testifying that the treatment team would have included classification and security staff from SCDC in case the inmates had "behavior" problems, in addition to the mental health treatment issues, because the purpose was to collectively share information).

A contrasting Sixth Circuit case where the plaintiff's claims were based on a similar theory is persuasive.  In Amick v. Ohio Department of Rehabilitation and Correction, 521 F. App'x 354 (6th Cir. 2013), the United States Court of Appeals for the Sixth Circuit addressed a claim against mental health providers at a prison where the plaintiff's decedent's mental illness led him to attack his cellmate, who then killed the decedent.  The Sixth Circuit found the facts pled there were insufficient to state a claim because the medical professionals did not ignore or disregard the decedent's mental health issues, even though they failed to prescribe medication for him.  Id. at 359-60.  Notably, the Sixth Circuit found that the pleadings showed that the medical professionals did not exhibit conscious disregard for the risk to decedent because they either "directed, concurred, or acquiesced in the determination by the custodial staff to place him in a cell by himself."  Id. at 359.  Though the decedent was ultimately placed in a cell with another inmate, the Sixth Circuit found there was no basis to attribute that fault as deliberate indifference by the medical professionals.  Id.

Here, although Dr. Poiletman arguably took some action in response to the risk *to Philip* from his mental health issues by recommending counseling for Philip, nothing suggests that he took any reasonable action in response to the risk *to other inmates* from Philip's active auditory

hallucinations. Based on the record before the court, a reasonable jury could conclude that Dr. Poiletman had actual knowledge of the substantial risk to others—homicidal behavior—imminently presented by Philip's active auditory hallucinations, but consciously disregarded that risk by failing to notify security personnel.[10] See Farmer, 511 U.S. at 842-43 ("For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (internal quotation marks omitted); Parrish, 372 F.3d at 303 ("The risk of injury must be so obvious that the fact-finder could conclude that the officer did know of it because he could not have failed to know of it."); (Med. Rec., ECF No. 118-2; Med. Rec., ECF No. 108-13 at 3;

[10] Because there is evidence in the record from which a reasonable jury could conclude that Dr. Poiletman consciously disregarded a risk of which he had actual knowledge, Dr. Poiletman is also not entitled to qualified immunity. Qualified immunity is not available to an official who should reasonably know that he is violating clearly established law. See generally Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (providing that an official's conduct violates clearly established law when, at the time of the challenged conduct, every "reasonable official would have understood that what he is doing violates that right") (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)); Pearson v. Callahan, 555 U.S. 223, 231-32 (2009); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Here, a question of fact exists as to whether Dr. Poiletman knew that his failure to notify security personnel of Philip's homicidal potential subjected other inmates to an unconstitutional risk of harm. Therefore, the court cannot conclude as a matter of law that Dr. Poiletman did not reasonably know that his actions violated clearly established law. See Brooks v. Johnson, 924 F.3d 104, 118-20 (4th Cir. 2019) (rejecting an assertion of qualified immunity where a jury could find under the subjective prong of an Eighth Amendment excessive force claim that the official acted with a wrongful or malicious motive); see also Thompson v. Commw. of Va., 878 F.3d 89, 106 (4th Cir. 2017) ("For claims where intent is an element, an official's state of mind is a reference point by which she can reasonably assess conformity to the law because the case law is intent-specific."); Cox, 828 F.3d at 238 n.4 (collecting out-of-circuit cases categorically rejecting the need to consider the objective reasonableness prong of the qualified immunity analysis where summary judgment is denied on the merits of a deliberate indifference claim).

Schwartz-Watts Psychiatric Evaluation, ECF No. 118-1 at 1-7).[11] Finally, Dr. Husted's testimony permits (although of course does not compel) a reasonable inference that Philip's auditory hallucinations caused Philip to kill on April 7.

As to Defendants Bradley, Dr. Ridgeway, and Thompson, however, Plaintiff fails to point to evidence from which a reasonable jury could conclude that these defendants had actual knowledge that Philip or Simmons posed a substantial risk of harm to other inmates. Plaintiff argues that these defendants, like Dr. Poiletman, had access to the inmates' medical records, and accordingly, a jury could infer that they were aware of the inmates' propensity for violence and consciously disregarded that risk. The court disagrees because, unlike Dr. Poiletman, these defendants did not provide any treatment to Philip or Simmons. Moreover, as more fully discussed below, the record does not support a finding that attendance at treatment team meetings exposed these officials to the details of their care. See Farmer, 511 U.S. at 842-43.

Bradley, a licensed social worker, was the lead counselor for the ICS program. She did not provide individual counseling to Philip or Simmons, but she attended their treatment team meetings. Dr. Ridgeway, SCDC's Chief Psychologist also attended treatment team meetings as a representative for his department, but he did not individually treat any inmates. Thompson, the Associate Warden of the prison, attended treatment team meetings but only as a liaison from the warden's office. The unrefuted evidence shows that these defendants had no role in providing mental health treatment to Philip or Simmons or in supervising Dr. Poiletman or the counselors'

[11] Although Dr. Schwartz-Watts's report as to Philip was prepared in connection with her service on his criminal defense team, the medical records indicate that she called the SCDC mental health clinic administration about Philip when he was admitted to Gilliam—SCDC's psychiatric hospital—and that her report was made a part of Philip's medical records at SCDC. (See Med. Rec., ECF No. 118-2.) A reasonable jury could therefore infer that Dr. Poiletman was exposed to that information about the risk to others from Philip's auditory hallucinations. See Farmer, 511 U.S. at 842-43.

clinical work. Plaintiff has not presented any evidence that these defendants reviewed the medical records of Philip or Simmons, or that their roles on the treatment team were such that they must have known the contents of their medical records. Nor does Plaintiff point to any evidence that the treatment team was expressly warned at any time—much less while these defendants were in attendance—that Philip or Simmons were substantially likely to harm other inmates.[12] See Farmer, 511 U.S. at 837 (describing the risk that must be shown as "excessive," "substantial," or "significant").

Therefore, Plaintiff cannot establish the actual knowledge element of a deliberate indifference claim against these defendants because the record is devoid of evidence that the defendants were actually aware of or exposed to information warning them of a unique risk from Philip or Simmons. See Farmer, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); see also Rich v. Bruce, 129 F.3d 336, 339 (4th Cir. 1997) (finding that the defendant was aware of the general risk of violence to the plaintiff by other inmates, but also finding that the plaintiff's deliberate indifference claim failed where the defendant did not have actual knowledge that his actions "uniquely increased" the risk of violence to the plaintiff). Nor does the record show that the risk would have been obvious to them, since their roles on the treatment team did not require them to review the inmates' medical records and determine their risk of violence. See Parrish, 372 F.3d at 303 ("The risk of injury must be so obvious that the fact-

[12] Notably, Bradley left her position with SCDC in December 2016. Dr. Ridgeway left his position on February 6, 2017, two months before the murders, and Dr. Ridgeway testified that after August 2016, he did not reliably attend treatment team meetings because of duties elsewhere. Even assuming Plaintiff could show that the treatment team was made aware of a specific risk of harm from Philip and Simmons, Plaintiff would have to point to evidence that the risk was conveyed to the treatment team while Bradley and Dr. Ridgeway were present.

finder could conclude that the officer did know of it because he could not have failed to know of it.") (quotation marks and alterations omitted). Based on the foregoing, Defendants Bradley, Dr. Ridgeway, and Thompson are entitled to summary judgment as to Plaintiff's failure to protect claim.

**C. Deliberate Indifference to Scruggs's Medical Needs**

Plaintiff claims that the defendants were deliberately indifferent to Scruggs's mental health needs. Specifically, Plaintiff argues that Scruggs had psychosis, but the defendants failed to diagnose and treat Scruggs's psychosis, resulting in the deterioration of Scruggs's condition and his March 2017 cutting incident. (Pl.'s Resp., ECF No. 111 at 11-12.)

Deliberate indifference by prison personnel to a prisoner's medical needs is also actionable under the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016). Claims of deliberate indifference to a prisoner's medical needs are also evaluated under the test in Farmer. For the objective prong, the plaintiff must demonstrate that the official was deliberately indifferent "to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' " Scinto 841 F.3d at 225 (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)). For the subjective prong, the plaintiff must demonstrate "the official's 'actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.' " Scinto, 841 F.3d at 226 (alterations omitted) (quoting Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014)).

Not "every claim by a prisoner [alleging] that he has not received adequate medical treatment states a violation of the Eighth Amendment." Estelle, 429 U.S. at 105. To establish deliberate indifference, the treatment "must be 'so grossly incompetent, inadequate or excessive

as to shock the conscience or to be intolerable to fundamental fairness.' " Hixson v. Moran, 1 F.4th 297, 302 (4th Cir. 2021) (quoting Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990)). Mere negligence, malpractice, or incorrect diagnosis is not actionable under 42 U.S.C. § 1983. See Estelle, 429 U.S. at 106; see also Hixson, 1 F.4th at 302 ("Once prison officials are aware of a serious medical need, they only need to 'respond[ ] reasonably to the risk.' ") (quoting Farmer, 511 U.S. at 844); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged.") (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3rd Cir. 1970)).

Plaintiff asserts that the defendants who attended Scruggs's treatment team meetings—Dr. Poiletman, Lead Counselor Bradley, Chief Psychologist Dr. Ridgeway, and Associate Warden Thompson—were deliberately indifferent to Scruggs's psychosis. To establish the objective prong of the Farmer test, Plaintiff argues that the mental health treatment Scruggs received in the ICS unit—both Dr. Poiletman's psychiatric care and the counseling Scruggs received from Bradley and others—was so deficient that it amounted to a "sufficiently serious" deprivation posing a risk of harm that amounted to cruel and unusual punishment. To support this claim, Plaintiff provides testimony from her expert, Dr. David S. Husted, who reviewed the treatment records of Scruggs and the deposition testimony of the defendants. Dr. Husted testifies that Dr. Poiletman misdiagnosed Scruggs with malingering and major depressive disorder, rather than psychosis, which Dr. Poiletman should have understood by reading Scruggs's medical records. Dr. Husted asserts that Dr. Poiletman does not review patient medical records and counseling notes and instead diagnoses and decides a course of treatment based on what he observes in the moment. Dr. Husted opines that no reasonably prudent clinician who is actually paying attention to the patient and his

history would have diagnosed Scruggs with malingering and major depressive disorder. Dr. Husted describes Dr. Poiletman's care as "loose diagnosing, loose treatment, and grossly inept care." (Husted Dep. at 63, ECF No. 112-1 at 63.) As to the deficiencies in the counseling Scruggs received from Bradley and others, Dr. Husted opines that the individual and group counseling provided to Scruggs did not occur at the frequency or at the level of quality needed for his condition. Specifically, Dr. Husted points to the period between November 29, 2016 and January 19, 2017 during which Scruggs did not see a counselor or attend a group therapy session.

As to the subjective prong, Plaintiff argues that the defendants had actual knowledge of the purportedly unconstitutional mental health treatment in the ICS unit, but the defendants failed to take action to correct it for Scruggs. Plaintiff points to Sandra Johnson's warnings about the lack of counseling in the ICS unit and the risks to inmate and staff safety and notes that Johnson raised her concerns directly to Bradley, Dr. Ridgeway, and Thompson. Plaintiff also relies on Johnson's testimony that Dr. Poiletman was aware of her concerns. Plaintiff further relies on Dr. Husted's testimony that Dr. Poiletman was aware that counselors were not providing sufficient counseling because it was his duty as the head of the treatment team to ensure that counselors were providing the therapy ordered by the treatment team.

The court concludes that Plaintiff has failed to produce any evidence from which a reasonable jury could conclude that the defendants were deliberately indifferent to Scruggs's medical needs. The record is undisputed that Scruggs received treatment for his mental health. Dr. Husted opines that Dr. Poiletman misdiagnosed Scruggs, but a failure to properly diagnose a patient alone cannot support a claim for deliberate indifference to medical needs. See Wester v. Jones, 554 F.2d 1285, 1286 (4th Cir. 1977) ("Even if the doctor were negligent in examining [the plaintiff] and in making an incorrect diagnosis, his failure to exercise sound professional judgment

would not constitute deliberate indifference to serious medical needs.") (citing Estelle, 429 U.S. at 106); Bridges v. Keller, 519 F. App'x 786, 787 (4th Cir. 2013) (stating that the plaintiff's complaint failed to state a claim for deliberate indifference to medical needs where he alleged that the prison medical personnel promptly responded to his complaints of injury and regularly administered treatment, even though the plaintiff alleged that the officials "utterly failed to correctly diagnose his injury"). Dr. Poiletman regularly evaluated Scruggs, made diagnoses, prescribed treatment, and attended treatment team meetings in which he gave input in crafting Scruggs's treatment plan. Even if Scruggs was not provided the level and quality of psychiatric treatment Dr. Husted would provide, the record does not support a reasonable conclusion that Dr. Poiletman consciously disregarded a serious risk to Scruggs's mental health. See Williams v. Branker, 462 F. App'x 348, 354 (4th Cir. 2012) (rejecting an inmate's claim that "the lack of effective mental health treatment," without evidence he was denied treatment "to a considerable extent," could support a deliberate indifference claim).

In that vein, this case is similar to the United States Court of Appeals for the Fourth Circuit's recent decision in Hixson v. Moran, 1 F.4th 297 (4th Cir. 2021). In that case, Hixson was an inmate held in a Virginia jail. Prior to his incarceration, Hixson was diagnosed with type-2 diabetes and prescribed injectable insulin and oral medication. Upon entering the jail, Hixson informed the medical staff that he had insulin dependent diabetes, but the medical staff was initially unable to acquire Hixson's medical records and confirm his diagnosis. In the meantime, the jail's doctor, Dr. Moran, placed Hixson on a diabetic diet, ordered daily testing of Hixson's blood sugar and reviewed those tests, and ordered increased testing when Hixson's blood sugar rose. Dr. Moran decided against prescribing insulin because he was concerned about Hixson overdosing on

insulin he did not need.  During his time in jail, Hixson experienced elevated blood sugar levels and symptoms therefrom.  Hixson, 1 F. 4th at 300.

Hixson filed a § 1983 suit against Dr. Moran claiming that the doctor was deliberately indifferent to Hixson's medical needs.  Hixson presented the district court with expert deposition testimony from Dr. Carol Rupe, who opined that Dr. Moran violated the standard of care in treating Hixson's blood sugar levels.  Dr. Rupe testified that Dr. Moran should have initially prescribed diabetes medication and that his failure to administer insulin caused the variation in Hixson's blood sugar readings.  The district court granted summary judgment to Dr. Moran, finding that he was not deliberately indifferent to Hixson's medical needs for choosing not to administer any medication.  Hixson, 1 F. 4th at 300-01.

On appeal Hixson argued that Dr. Rupe's testimony created a genuine issue of material fact.  The Fourth Circuit disagreed, stating:

> Dr. Rupe stated that Dr. Moran's actions violated the standard of care.  At first blush, this might appear to present a classic question of fact to be resolved by a jury.  However, Dr. Rupe at most determined that Dr. Moran's actions were negligent.  As we have already explained, mere negligence is not enough to show deliberate indifference.  See Farmer, 511 U.S. at 835, 114 S. Ct. 1970.  Dr. Rupe's testimony therefore does not create an issue of *material* fact.
>
> Essentially, the medical professionals in this case disagree about what the proper course of treatment should have been for Hixson.  However, a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim.  The uncontroverted evidence of Dr. Moran's constant monitoring of Hixson's blood sugar levels and his control of Hixson's diet show clearly his concern for Hixson's medical well-being.  Because Hixson failed to forecast evidence showing that Dr. Moran's alternative treatment plan was "so grossly incompetent" as to permit a finding of deliberate indifference, the district court properly granted summary judgment.

Hixson, 1 F.4th at 303.  As Hixson shows, Dr. Husted's opinion that Dr. Poiletman misdiagnosed Scruggs's psychosis is insufficient to create a genuine issue of material fact as to whether Dr. Poiletman was deliberately indifferent to Scruggs's mental health.  See also Campbell v. Florian,

972 F.3d 385, 394 (4th Cir. 2020) ("Obduracy and wantonness, not inadvertence or error in good faith, characterize the conduct prohibited by the Cruel and Unusual Punishments clause.") (quoting Wilson, 501 U.S. at 298); Brice, 58 F.3d at 105 ("[D]eliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law.") (citing Farmer, 511 U.S. at 836).

Plaintiff relies on Dr. Poiletman's testimony that he does not supervise the individual and group counselors and he does not ensure that counselors' therapy sessions follow treatment plans that he helps craft in treatment team meetings. Plaintiff argues that this purported admission shows that Dr. Poiletman was deliberately indifferent to Scruggs's lack of counseling, which caused his psychosis to worsen. But this argument conflates Dr. Poiletman's duty to his patients with his duties as an SCDC employee. Dr. Poiletman testified only that he did not supervise the counselors to ensure that they were doing their jobs. (See Poiletman Dep. at 168-71, ECF No. 112-11 at 43-44.) The undisputed evidence is that supervision of the counselors lay within the purview of Dr. Ridgeway, Bradley, or the ICS program manager, Kim Jones—not Dr. Poiletman. (See Poiletman Dep. at 168-72, ECF No. 112-11 at 43-44; Wood Dep. at 154, 157-59, ECF No. 112-14 at 154, 157-59; Ridgeway Dep. at 61, ECF No. 112-15 at 62; Bradley Dep. at 44, ECF No. at 44.) The testimony of Dr. Poiletman relied on by Plaintiffs does not support a conclusion that he fails to review counseling session notes in the psychiatric treatment of his patients. Therefore, the record in this case does not support Plaintiff's claim that Dr. Poiletman was deliberately indifferent to any substantial risk to Scruggs from insufficient counseling.

To the extent Plaintiff specifically argues that Dr. Poiletman's failure to read medical records or counseling notes was the conscious disregard to the risk of harm, no reasonable jury on this record could conclude that Dr. Poiletman did not read Scruggs's medical records or counseling

notes. Dr. Husted testified that Dr. Poiletman did not read the notes, but Dr. Husted had no personal knowledge to support that assertion. Rather, Dr. Husted *supposed* that Dr. Poiletman did not read medical records because Dr. Husted believes that any doctor who read Scruggs's medical records would agree that Scruggs suffered from psychosis. Dr. Husted's conjecture, however, is not supported by the record, and is insufficient to create a genuine issue of material fact with respect to any conscious disregard by Dr. Poiletman. See Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.") (citing Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984)).

As to the purported lack of counseling, Bradley is the only named defendant to have provided counseling to Scruggs. Plaintiff points to the gap between counseling sessions for Scruggs from November 29, 2016 and January 19, 2017 to show that the lack of counseling caused the decline in his condition. However, the lack of counseling during that period cannot be fairly attributed to Bradley on this record. Bradley left her position with SCDC in December 2016, and Plaintiff fails to point to any evidence in the record tending to show that Bradley caused Scruggs to not receive counseling sessions during the relevant time. See Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts . . . require a demonstration of both but-for and proximate causation."); see also Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986).

Plaintiff also relies on Dr. Husted's opinion that Bradley's counseling was inadequate, but Dr. Husted's opinion does not address any counseling Bradley specifically provided to Scruggs. Plaintiff cannot show conscious indifference merely by criticizing Bradley's competence as a mental health counselor generally. Rather, Plaintiff must point to evidence that Bradley was deliberately indifferent to a known risk of harm to Scruggs, and that Bradley's inaction was the

proximate cause of Scruggs's injury.  See Iko, 535 F.3d at 241 (stating that the plaintiff must show actual knowledge of the risk of harm and that officer must also have recognized that her actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs) (quoting Parrish, 372 F.3d at 303.  Plaintiff's theory of the case for her claim of deliberate indifference to Scruggs's medical needs is that Scruggs was psychotic but misdiagnosed by Dr. Poiletman.  But *Bradley* could not reasonably be found to have been deliberately indifferent to a mental illness of which she was unaware and not qualified to diagnose.  See Scinto, 841 F.3d at 225 (stating that a "serious medical need" is one that has been diagnosed *by a physician* as mandating treatment or is so obvious that even a lay person would recognize need for medical attention).  And Plaintiff points to no evidence that Bradley's counseling could have detected Scruggs's psychosis.

As to Dr. Ridgeway and Thompson, they are entitled to summary judgment for the same reasons they are entitled to summary judgment as to Plaintiff's failure to protect claim.  Dr. Ridgeway and Thompson had no role in providing mental health treatment to Scruggs or in supervising Dr. Poiletman or the counselors' clinical work.  Plaintiff has not presented any evidence that these defendants were exposed to inmates' medical records, or that their duties on the treatment team were such that they must have known their contents.  Rather, the record supports only the opposite conclusion.  (Ridgeway Dep. at 65, 68-71, ECF No. 112-15 at 66, 69-72; Thompson Dep. at 47-50, 57, ECF No. 106-5 at 8-12.)  Nor does Plaintiff identify any evidence that the treatment team was expressly warned that Scruggs was experiencing psychosis or otherwise decompensating.  Further, no evidence supports an inference that the risk would have been obvious to them, as their roles on the treatment team did not require them to review the inmates' medical records and determine their risk of decompensating.

Based on the foregoing, Defendants Dr. Poiletman, Bradley, Dr. Ridgeway, and Thompson are entitled to summary judgment on Plaintiff's deliberate indifference to medical needs claim.

**D.     Supervisory Liability**

Plaintiff claims that the individually named defendants should be held liable for the purported mismanagement of Philip's, Simmons's, and Scruggs's mental health care and resulting harm to Scruggs under a theory of supervisory liability.  Specifically, Plaintiff argues that the defendants knew that the inmates in the ICS unit were given deficient mental health treatment but did nothing to correct it, resulting in (1) Philip and Simmons turning violent and murdering Scruggs, and (2) Scruggs's mental health declining prior to his murder.

In § 1983 suits, supervisory officials may not be held liable under a *respondeat superior* theory of liability for the unconstitutional actions of their subordinates.  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  However, a supervisor's "indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984).  The Fourth Circuit has adopted the following test to determine whether the plaintiff can demonstrate supervisory liability:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and
>
> (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).  The behavior that poses a risk of constitutional injury must be "widespread" or at least have occurred on "several different occasions"; single or isolated incidents are not enough.  Id.  Specifically as to the second element, the plaintiff bears a

"heavy burden of proof in establishing deliberate indifference," but it may be shown by the supervisor's "continued inaction in the face of documented widespread abuses." Id. (quoting Slakan, 737 F.2d at 372-73.)  In light of the potentially limitless number of officials who could ultimately be liable, the "outer limits" of supervisory liability are determined by "pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." Slakan, 737 F.2d at 373.

Plaintiff argues the defendants were aware that the inmates in the ICS unit were provided deficient mental treatment because of the 2005 class action lawsuit against SCDC and because of Sandra Johnson's complaints.  Specifically, Plaintiff argues that the class action trial court's findings (though ultimately vacated) and the settlement agreement put the defendants on notice that the mental health treatment program at SCDC was constitutionally deficient and set standards for constitutionally adequate treatment for which SCDC officials should have been aware at the time Philip, Simmons, and Scruggs were in the ICS unit.  Plaintiff also stresses the trial court's express criticism of Dr. Poiletman's lack of knowledge about other SCDC treatment programs and mental health counselor's duties or his lack of involvement or knowledge of drafting treatment plans for inmates.  Additionally, Plaintiff relies on Sandra Johnson's warnings to SCDC officials that the lack of or deficient mental health counseling and generally poor treatment of inmates in the ICS unit was creating a dangerous situation for inmates and staff.

For most of the defendants, Plaintiff fails to reference any evidence from which a reasonable jury could conclude that the defendant's inaction was the proximate cause of any injury to Scruggs.  Specifically, Plaintiff fails to identify evidence tending to show that these defendants could have taken any action to correct or improve the inmates' treatment.  See Slakan, 737 F.2d at 373.  For instance, Plaintiff cites no evidence in the record that the SCDC Defendants—Warden

Riley and Associate Warden Thompson—had any decision-making authority over inmate medical treatment.  Id. (requiring a plaintiff to identify the decision maker whose deliberate indifference permitted the constitutional abuses to continue unchecked); see also Iko, 535 F.3d at 242 (stating that generally, a non-medical prison official can rely on his medical staff's examinations and diagnoses) (citing Miltier, 896 F.2d at 844-55, and Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004)); cf. Shakka v. Smith, 71 F.3d 162, 167 (4th Cir. 1995) (finding prison officials were not deliberately indifferent to an inmate's medical needs where they followed the instructions of the prison psychologist and noting that the officials may have instead incurred liability for interfering in the inmate's treatment).

Plaintiff argues that Riley and Thompson were responsible for ensuring the security of inmates in the ICS unit.  That may be true generally, but the question in this case is whether Riley and Thompson could *themselves* have taken action to correct the inmates' mental health treatment, and Plaintiff cites no such evidence.  Rather, the unrefuted evidence in the record shows that these defendants had no supervisory role over mental health treatment personnel.  (Thompson Dep. at 47-50, 57, ECF No. 106-5 at 8-12.)  As explained above, though Thompson attended treatment team meetings, she did so only as a liaison to Warden Riley's office and did not supervise the mental health professionals' work.  (Id.)  Therefore, Plaintiff cannot show that some omission or tacit authorization by Riley or Thompson caused the inmates' purportedly deficient treatment and propensity for violence or declining mental health.  See Slakan, 737 F.2d at 373, 376 (providing that to demonstrate supervisory liability, the plaintiff must show "corrective inaction" to misconduct and that the risk of harm would be a "natural and foreseeable consequence" of the inaction).  To hold Riley and Thompson liable here regardless of whether their own individual actions were the proximate cause of the injury would amount to *respondeat superior* liability.  See

Iqbal, 556 U.S. at 677 (rejecting the argument that supervisory liability can attach based on a supervisor's mere knowledge of unconstitutional conduct of subordinates and stating that a government official can only be held liable for his or her own misconduct); Iko, 535 F.3d at 242; Shakka, 71 F.3d at 167.

The same analysis applies to DuBose and Fate. DuBose, a social worker, was the Division Deputy Director of Behavioral Health, which included alcohol and drug treatment programs, and the pre-release program. Fate was the Deputy Director of Health Services, an administrative position. The evidence unequivocally shows that DuBose and Fate had no involvement with the clinical treatment of inmates. (Fate Dep. at 130-32, ECF No. 108-10 at 3-5; DuBose Dep. at 46-47, 55, ECF No. 108-11 at 5-7.) Plaintiff fails to cite any evidence in the record that these defendants' own personal inaction caused Philip, Simmons, or Scruggs to decompensate. Plaintiff argues that these defendants were made aware of Sandra Johnson's complaints about inmate treatment. But knowledge of misconduct alone is not sufficient to establish supervisory liability. Iqbal, 556 U.S. at 677. And here, Plaintiff cites no evidence that DuBose or Fate had the authority to correct the inmates' treatment. See Iko, 535 F.3d at 242; Shakka, 71 F.3d at 167.

As to Dr. Poiletman, Plaintiff's supervisory claim fails for a more fundamental reason—Dr. Poiletman had no subordinates. Plaintiff argues that Dr. Poiletman's position as the head of the treatment team means that he supervised clinical counselors. Specifically, Plaintiff argues that Dr. Poiletman was responsible for ensuring that inmates were receiving proper counseling. However, Plaintiff again confuses Dr. Poiletman's duty to his patients with his responsibilities as an SCDC employee. Dr. Poiletman testified that it was not within his duties to direct counselors' work. (Poiletman Dep. at 168-171, ECF No. 112-11 at 43-44.) According to Dr. Beverly Wood, SCDC's Director of Behavioral Health, psychiatrists were not supervisors of the counselors.

Instead, Dr. Wood testified that counselors were supervised by Dr. Ridgeway and the ICS program manager, and if the psychiatrist had recommendations for different counseling for their patients, they would inform the program manager. (Wood Dep. at 154, 157-59, ECF No. 112-14 at 154, 157-59.) Plaintiff cites to no evidence undermining the testimony of Dr. Poiletman and Dr. Wood that Dr. Poiletman did not supervise counselors. Therefore, no reasonable jury could conclude that Dr. Poiletman was deliberately indifferent to misconduct by a subordinate. See Shaw, 13 F.3d at 799.

As to Dr. Wood, Plaintiff's supervisory liability claim against her fails for a different reason: no reasonable jury could find on this record that she failed to take reasonable corrective action to improve inmate treatment following the 2005 class action lawsuit.[13] Dr. Wood testified that she was aware of the class action lawsuit and the trial court's criticism of the psychiatric treatment of inmates, including treatment by Dr. Poiletman. But Dr. Wood testified that, as the Director of Behavioral Health, she took action to correct the problems identified by the trial court. (Wood Dep. at 45, ECF No. 112-14 at 45.) She provided training to the psychiatrists, including Dr. Poiletman. (Id. at 87, 90, ECF No. 112-14 at 87, 90.) She testified that she worked to get the psychiatrists more involved in creating treatment plans, and to her knowledge, Dr. Poiletman attended treatment team meetings and gave input as he was supposed to pursuant to SCDC's policies created in response to the class action lawsuit. (Id. at 77-79, ECF No. 112-14 at 77-79.)

Therefore, even assuming without deciding that the 2005 class action lawsuit was sufficient to give Dr. Wood actual or constructive knowledge of a risk of harm to Scruggs based on the

[13] And with respect to Sandra Johnson's criticisms, Plaintiff has identified no evidence tending to show that Dr. Wood was made aware of them.

purportedly deficient mental health treatment of inmates,[14] this record indisputably shows that Dr. Wood took reasonable corrective action in response to that knowledge. On this record, no reasonable jury could conclude that Dr. Wood was deliberately indifferent to the risk of injury identified in the class action lawsuit or that she tacitly authorized the misconduct. See Shaw, 13 F.3d at 799. Additionally, there is no evidence in the record that Dr. Wood was aware of Sandra Johnson's criticisms of the ICS unit, but even if she had been made aware, those criticisms focused on deficiencies in *counseling* and Dr. Wood's unrefuted testimony was that she had no supervisory authority over clinical counselors. (Wood Dep. at 154, 157-59, ECF No. 112-14 at 154, 157-59.) Thus, no jury could reasonably find an affirmative causal link between any action or inaction by Dr. Wood to any harm suffered by Scruggs as a result of the conduct of which Sandra Johnson complained.

As for Dr. Ridgeway and Bradley, both were directly warned by Sandra Johnson that the lack of counseling or deficient counseling in the ICS unit posed a danger to inmates and staff. However, Dr. Ridgeway testified without contradiction that after hearing Johnson's complaints, he went to the ICS unit to determine the truth of her claims, spoke with counselors including Bradley, but could not substantiate Johnson's claims. (Ridgeway Dep. at 161-64, ECF No. 112-15 at 162-65.) Bradley indicates she attended meetings with SCDC officials, including DuBose, to discuss Johnson's specific complaints about the ICS counseling program. (Johnson Dep. at 135-38, ECF No. 112-12 at 135-38.) Plaintiff points to no evidence undermining the defendants' testimony that Johnson's concerns were investigated, nor does Plaintiff forecast evidence

[14] Though it is not necessary for the disposition of this claim, it is not clear that the class action lawsuit itself could have made the actions of Philip and Simmons foreseeable.

suggesting that Johnsons' claims were substantiated by any SCDC official.[15]    Because the undisputed evidence shows that Johnson's complaints were investigated but not substantiated, no reasonable jury could conclude that these defendants were deliberately indifferent to or tacitly authorized the purported risk of harm identified by Johnson.  See Shaw, 13 F.3d at 799.

While Plaintiff and her expert focus on various, collective deficiencies within SCDC regarding mental health treatment in the ICS program, this is precisely the type of claim that cannot lie against an individual supervisor.  Iqbal and Shaw make clear that a supervisor can be held liable only for his or her own action or inaction, not institutional failure.  Other laws may provide a remedy for that, but § 1983 does not.  Controlling law requires Plaintiff to pinpoint the individual decision maker "whose deliberate indifference permitted the constitutional abuses to continue unchecked."  Slakan, 737 F.2d at 373.  Plaintiff has failed to do so here.

---

[15] Notably, no evidence in the record supports Johnson's vague testimony that life threatening events occurred regularly during her one year working in the ICS unit or shows that inmate-on-inmate violence was widespread in the ICS unit.

**ORDER**

For all of the foregoing reasons, it is hereby

**ORDERED** that the defendants' motions are **GRANTED** except as to Plaintiff's claim against Dr. Poiletman for failure to protect Scruggs from harm by Philip. [16]

**IT IS SO ORDERED**.

December 20, 2021
Columbia, South Carolina

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

[16] Plaintiff brings a § 1983 claim for "failing to establish a constitutional regime for providing medical and mental health treatment" pursuant to an unidentified constitutional amendment against Bryan Stirling in his *official* capacity as Director of SCDC, seeking *damages*. But a state official in his official capacity is not a "person" amenable to a damages suit pursuant to § 1983. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 67-68, 71 (1989) (holding that neither a State nor its officials acting in their official capacities are "persons" under § 1983 and finding that Congress did not intend to override the State's sovereign immunity by enacting the statute); see also Hafer v. Melo, 502 U.S. 21, 25-31 (1991); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 482-83 (4th Cir. 2005). Consequently, Stirling is entitled to summary judgment as a matter of law.